UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
CFIP MASTER FUND, LTD., on its own     :
behalf and on behalf of TIERS® Beach   :
Street 6 Synthetic CLO Floating Rate   :
Credit Link Trust, Series 2007-33F,    :
                                       :
                  Plaintiff,           :
                                       :
        -v-                            :        09 Civ. 6197 (JSR)
                                       :
CITIBANK, N.A., CITIGROUP GLOBAL       :        OPINION AND ORDER
MARKETS INC., CITIGROUP GLOBAL         :
MARKETS LIMITED, and U.S. BANK         :
NATIONAL ASSOCIATION,                  :
                                       :
                  Defendants.          :
------------------------------------ x
CITIGROUP GLOBAL MARKETS INC. and      :
CITIGROUP GLOBAL MARKETS LIMITED,      :
                                       :
                  Counterclaim-        :
                  Plaintiffs,          :
                                       :
        -v-                            :
                                       :
CFIP MASTER FUND, LTD.,                :
                                       :
                  Counterclaim-        :
                  Defendant.           :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

        In this action, plaintiff CFIP Master Fund, Ltd. (the "Fund")

asserts various claims against defendants Citibank, N.A., Citigroup

Global Markets Inc., and Citigroup Global Markets Limited

(collectively, the "Citi Defendants"), as well as against defendant

U.S. Bank National Association ("U.S. Bank"), arising from a credit

default swap transaction[1] entered into by these parties that was

_____

        [1] The Second Circuit has provided the following general
description of credit default swaps:

administered through a proprietary trust structure.  The Fund filed a

second amended complaint on January 29, 2010, and in response, the

Citi Defendants asserted three counterclaims against the Fund.  On

March 12, 2010, all parties moved for summary judgment.  The Court

received extensive written submissions in connection with these

motions and held oral argument on May 3, 2010.  After careful

consideration, and as specified more fully below, the Court grants

U.S. Bank's motion in full, and grants in part and denies in part the

motions of the Fund and the Citi Defendants.

Before turning to the parties' arguments, the Court recounts

the following undisputed background facts regarding the complex

credit default swap transaction from which this litigation arises.

The Fund, the plaintiff in this lawsuit, is a private investment fund

organized under the law of the Cayman Islands and managed by Chicago

Fundamental Investment Partners, LLC.  See Pl's Statement of

_____

A credit default swap is the most common form of credit
derivative, i.e., "a contract which transfers credit risk
from a protection buyer to a credit protection seller."
Protection buyers . . . can use credit derivatives to manage
particular market exposures and return-on-investment; and
protection sellers . . . generally use credit derivatives to
earn income and diversify their own investment portfolios.
Simply put, a credit default swap is a bilateral financial
contract in which "[a] protection buyer makes[] periodic
payments to . . . the protection seller, in return for a
contingent payment if a predefined credit event occurs in
the reference credit," i.e., the obligation on which the
contract is written.

Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of
N.Y., 375 F.3d 168, 171-72 (2d Cir. 2004) (alteration and third
omission in original) (footnotes omitted).

Undisputed Facts Pursuant to Local Civil Rule 56.1 in Support of its Motion for Summary Judgment Against Citi Defendants ("Pl's 56.1 Re: Citi") ¶ 1.[2]  Citibank, N.A. ("Citi") is a United States depository banking institution.  <u>See</u> Citi Defendants' Rule 56.1 Statement ("Citi 56.1") ¶ 4.  Citigroup Global Markets Inc. ("CGMI") is a New York corporation that operates as a securities brokerage firm.  <u>Id.</u> ¶ 5.  Citigroup Global Markets Limited ("CGML") is a United Kingdom-based investment bank.  <u>Id.</u> ¶ 6.  U.S. Bank is Minneapolis-based national banking association.  <u>See</u> U.S. Bank's Rule 56.1 Statement ("U.S. Bank 56.1") ¶ 5.

In February 2007, CGMI approached the Fund about entering into a credit default swap transaction.  Pl's 56.1 Re: Citi ¶ 5.  Over the next several months, the parties, represented by counsel, negotiated the form of this transaction.  <u>Id.</u> ¶¶ 6-17.  By May 2007, the Fund and CGMI had agreed that the Fund would provide credit protection on a "floating" rather than a "fixed" basis.  <u>Id.</u> ¶ 18.  In contrast to a "fixed" recovery transaction, where the credit protection seller pays a fixed percentage of a "notional" amount assigned to a particular company if that company experiences a credit event, in a "floating" recovery transaction the amount of the settlement payment due following a particular company's credit event is based on the post-credit event market valuation of that company's loans.  <u>Id.</u> ¶¶ 7, 10.

---

[2] In this opinion, citations to a party's statement of undisputed facts filed pursuant to Local Civil Rule 56.1 incorporate all corresponding paragraphs of the other parties' responsive statements.

On May 29, 2007, CGMI and the Fund executed a trade on the basis of a term sheet attaching a "Reference Portfolio" composed of 71 "Reference Entities" and identifying a "Reference Obligation" with respect to each Reference Entity.  Id. ¶¶ 19, 22.  The defined term "Reference Portfolio" refers to the list of companies for which the Fund provides credit protection; "Reference Entity" refers to each particular company in the overall Reference Portfolio; and "Reference Obligation" refers to the particular loan used as a basis for calculating the floating loss protection payment due following a credit event with respect to a given Reference Entity.

In June 2007, the parties negotiated the definitive documentation of this transaction.  See Pl's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 in Support of its Motion for Summary Judgment Against U.S. Bank ("Pl's 56.1 Re: U.S. Bank") ¶ 16. Consistent with the manner in which CGMI had arranged previous credit default swap transactions, the instant credit default swap was structured such that the Fund purchased the beneficial interest in credit-linked notes issued by a trust referred to as the TIERS® Beach Street 6 Synthetic CLO Floating Rate Credit Linked Trust, Series 2007-33F, (the "Trust"); as a result, the Trust, rather than the Fund directly, was the credit protection seller.  CGMI used this particular structure for the reason, among others, that doing so permitted CGMI to obtain relief from Citi's regulatory capital requirements.  Pl's 56.1 Re: Citi ¶ 24.  Accordingly, as discussed in more detail below, the closing of this transaction involved the

4

creation of the Trust and the designation of U.S. Bank as Trustee. Pl's 56.1 Re: U.S. Bank ¶ 25.

This transaction closed on June 29, 2007 and is memorialized in the form of various interrelated agreements. The Trust was created pursuant to a Series Trust Instrument ("STI"), annexed to which is a Master Trust Agreement Supplement ("MTAS"), that in turn incorporated an April 6, 2006 Base Trust Agreement ("BTA"), to which CGMI and U.S. Bank, as Trustee, are parties. Decl. of Rachel M. Cherington, 3/12/10 ("Cherington Decl."), Exs. 6 (STI & MTAS) & 7 (BTA). The credit default swap component of the transaction is memorialized in the form of a Default Swap Confirmation ("Confirmation") between CGML,[3] as "Protection Buyer" or "Party A," and U.S. Bank, as Trustee for the Trust, which is the "Protection Seller" or "Party B." The Confirmation incorporates "Standard Swap Terms," a June 29, 2007 International Swaps and Derivatives Association ("ISDA") Master Agreement between CGML and the Trust, and the 2003 ISDA Credit Derivatives Definitions (the "ISDA Definitions"). Id. Exs. 8 (Confirmation/Standard Swap Terms/ISDA Master Agreement) & 9 (ISDA Definitions).[4] These agreements, taken together, require the Trust to cover the first $44,988,000 in amounts due under the credit default swap based on the Reference Portfolio.

---

[3] The transaction designated CGML, as opposed to Citi, as protection buyer because of tax concerns arising from Citi's issuance of the certificate of deposit that would serve as the Term Asset. Pl's 56.1 Re: Citi ¶¶ 25-26.

[4] The Confirmation was amended on January 16, 2009, in respects not relevant to this lawsuit, following a downgrade of Citi's credit rating. Citi 56.1 ¶ 22.

By its terms, the Confirmation is set to terminate on December 20, 2011.

At the time of the closing, the Fund purchased all beneficial interest in $44,988,000 of Class F credit-linked certificates (the "Class F Certificates") issued by the Trust. Pl's 56.1 Re: Citi ¶ 41.[5] With the $44,988,000 paid by the Fund, the Trust purchased a certificate of deposit from Citi, referred to as the "Term Asset." Id. ¶ 45. Under the swap, CGML pays the Trust (for the benefit of the Fund) a quarterly fee based on the outstanding notional amount of the Reference Portfolio, which was initially established by the Confirmation to be $552 million. Citi 56.1 ¶¶ 24-25. As of April 5, 2010, CGML's fixed payments to the Trust totaled over $11.5 million. Id. ¶ 28. In addition, the agreements entitle the Fund to receive the interest earned by the Trust on the Term Asset. Id. ¶ 14. The Fund, as sole beneficial owner of the Class F notes, is to receive the amounts remaining in the Term Asset upon the scheduled termination of the Trust. Id. ¶ 58.

When loss protection payments become due to CGML under the swap because a credit event occurs with respect to a given Reference Entity, the Trustee funds that payment by liquidating a portion of the Term Asset, id., thus reducing both the amount of principal returned to the Fund on termination and the amount of the periodic coupon payments to the Fund over the term of the swap. Consistent

---

[5] These Certificates were initially issued by CGMI, which then offered them to the Fund via a June 29, 2007 Private Placement Memorandum ("PPM"). Citi 56.1 ¶ 12; see also Cherington Decl., Ex. 5 (PPM).

with the "floating" nature of this transaction, the precise amount required to be paid with respect to a credit event is based on a market valuation of the corresponding Reference Obligation. This valuation must take place on a particular business day selected by CGML "in its discretion (acting in a commercially reasonable manner)" that falls between 45 and 60 "Business Days" after the date that an effective credit event notice is issued, with "Business Days" defined to exclude New York and London bank holidays. Confirmation, Annex A, at 10, ISDA Defs. § 1.16. The swap's valuation procedures provide for CGML to obtain bids on that day from unaffiliated dealers that it selects, and these bids may be made at any time selected by CGML "in its sole discretion (acting in a commercially reasonable manner)" during business hours. Confirmation, Annex A, at 9-11.

The Fund filed this lawsuit on July 10, 2009. Its complaint, as twice amended, brings various claims against the Citi Defendants and U.S. Bank arising from the following events that occurred under the swap: (1) a credit event that occurred when Lyondell Chemical Company ("Lyondell"), one of the Reference Entities, filed for bankruptcy in January 2009; (2) credit events that occurred in late March 2009 in connection with the bankruptcies of two other Reference Entities: Charter Communications Operating, LLC ("Charter") and Idearc Inc. ("Idearc"); and (3) CGML's substitutions into the Reference Portfolio of various Reference Obligations in May and August 2009.[6] On February 22, 2010, the Citi Defendants asserted

---

[6] The Trustee has paid CGML approximately $15,676,800 as a result of the credit events experienced by Lyondell, Charter, and

three counterclaims against the Fund seeking, among other things, declarations that the Fund has defaulted under, and otherwise violated, the swap agreements.

The various issues presented by the parties' summary judgment motion may be grouped into three broad categories. First, the parties dispute the propriety of the Citi Defendants' actions with respect to the events occurring under the swap that give rise to this litigation. Second, the parties dispute the extent to which U.S. Bank can be held liable in its role as Trustee under the swap. Third, the parties dispute the Fund's standing to bring claims against the Citi Defendants and/or U.S. Bank.[7]

The Court turns first to the cross-motions for summary judgment filed by the Fund and the Citi Defendants. (For purposes of this discussion, the Court assumes arguendo that the Fund has standing to bring claims against the Citi Defendants.) The first aspect of the Fund's claims in this respect has to do with the credit event experienced by Lyondell in January 2009, and the basic facts relevant thereto are as follows. The Reference Obligation identified for Lyondell in the Confirmation is a loan with the "Bloomberg Loan Identifier" LN193943. Citi 56.1 ¶¶ 87-88. The identification of this particular loan as the Lyondell Reference Obligation was a

---

Idearc. Citi 56.1 ¶ 29.

[7] Although these issues of standing are potentially dispositive, the Court discusses them last for purposes of exposition, because the analysis of standing requires an understanding of the operation of the credit default swap and trust structure in the context of the events in dispute in this litigation.

mistake, because the loan terminated in 2006, before the credit default swap transaction closed.  Id. ¶ 90.  It is undisputed that CGMI and the Fund in fact intended to designate a secured revolving Lyondell loan (the "Approved Lyondell Loan") bearing the Bloomberg number 287481, that, together with a related term loan, comprises a loan facility bearing the Bloomberg number LN287477, as the Lyondell Reference Obligation.  Id. ¶¶ 91, 98.

Lyondell filed for bankruptcy on January 6, 2009.  Id. ¶ 92.  On January 13, 2009, the Trustee was sent a Credit Event Notice stating that Lyondell's bankruptcy filing constituted a Credit Event under the Confirmation.[8]  This notice was sent on "Citi" letterhead, was signed by Frank A. Licciardello on behalf of "Citibank, N.A.," referred to the Beach Street 6 Trust, and identified Bloomberg number LN287477 as a "Reference Obligation."  Cherington Decl., Ex. 14.  Licciardello is an authorized signatory for CGML as well as for Citi.  Citi 56.1 ¶ 95.  The Trust received this notice and forwarded it to Depository Trust Corporation ("DTC"), which is the record owner of the Class F Certificates.  Id. ¶ 101.

However, in connection with an earlier (December 2007) merger between Lyondell and Basell AF S.C.A. ("Basell"), the Approved Lyondell Loan had been paid off in full and was no longer outstanding at the time of the January 13 Credit Event Notice.  Id. ¶ 99.  On January 28, 2009, CGML sent a Notice of Substitute Reference

---

[8] A "Credit Event" under the swap is to defined either to be a Reference Entity's "Bankruptcy" or a "Failure to Pay" on a senior secured loan.  Pl's 56.1 Re: Citi ¶ 66.

Obligation purporting to substitute LN385221 (the "Substituted
Lyondell Loan") -- a Lyondell term loan that was subordinated to
debtor-in-possession ("DIP") financing that was approved following
Lyondell's bankruptcy filing -- as the Lyondell Reference Obligation
pursuant to the swap agreements' Reference Obligation substitution
provisions, which are discussed in more detail below.  Id. ¶ 107, see
also Decl. of Kanchana Wangkeo Leung Re: Citi, 3/12/10 ("Leung Citi
Decl."), Ex. 15 (Notice of Substitute Reference Obligation).  On
January 29, 2009, the Fund objected to this substitution.  Citi 56.1
¶ 109.  On March 20, 2009, CGML advised the Trustee that it had
conducted a valuation of the Substituted Lyondell Loan and determined
that the "final price" based on this Reference Obligation for the
purpose of calculating the amount of the loss protection payment due
was 16.75%.  Id. ¶ 110.  Thereafter, the Trustee, applying that
percentage to the $11.04 million Notional Amount allocated to
Lyondell under the Confirmation, liquidated over $9 million of the
Term Asset, and made a payment to CGML over the Fund's objection.
Id. ¶ 111.

    The Fund attacks several aspects of the Citi Defendants'
actions with respect to the Lyondell Credit Event.  First, the Fund
raises procedural objections to the form of the January 13 Credit
Event Notice.  Under the ISDA Definitions, which are incorporated by
reference into the Confirmation, a Credit Event Notice is "an
irrevocable notice from a Notifying Party . . . to the other party
that describes a Credit Event that occurred . . . ."  ISDA Defs., §
3.3.  It is undisputed here that CGML is the Notifying Party under

the Confirmation and that the January 13 notice did not indicate that
the notice was sent on behalf of CGML.  Pl's 56.1 Re: Citi ¶ 68.

The Fund, however, made no objection to this
misidentification until after this lawsuit was filed, <u>see</u> Second Am.
Compl. ¶ 88, and the Fund nowhere identifies any harm or prejudice
that resulted from the error.  Indeed, as the Citi Defendants point
out, the ISDA Definitions permit a Credit Event Notice to be given
telephonically, and even though these definitions provide that
telephonic notices should be followed by a written confirmation, they
also state that a failure to supply this written confirmation "will
not affect the effectiveness of that telephonic notice."  ISDA Defs.
§§ 1.10, 3.3.  Thus, if Licciardello had conveyed the Credit Event
Notice telephonically rather than in writing, that notice would
unquestionably have been effective.

The Fund's only response to these indications that the
corporate identification error was immaterial is to assert that the
precise timing of an effective Credit Event Notice is of the utmost
importance because, as discussed below, the date of the notice
triggers a contractually defined "window" of 45 to 60 business days
from the date of the notice during which the market valuation of the
Reference Obligation must take place.  Thus, the Fund hypothesizes,
the Citi Defendants could have knowingly issued a technically
defective notice so as to give themselves the option of later
substituting a conforming notice so as to manipulate the timing of
the valuation window.  There is, however, no evidentiary support that

11

the Citi Defendants acted with any such nefarious intentions.[9]   In these circumstances, and especially absent any contemporaneous objection to the corporate misidentification or showing of any resulting prejudice, this Court "will not permit the plaintiff to capitalize on [a] technical naming error in contravention of the parties' evident intentions." Spanierman Gallery, P.S.P. v. Love, 320 F. Supp. 2d 108, 112 (S.D.N.Y. 2004).   Accordingly, the Court hereby denies the Fund's motion insofar as it seeks relief based on the corporate misidentification in the January 13 Credit Event notice.

Next, the Fund asserts that the January 13 notice was invalid because of several defects going beyond the corporate misidentification, including that (1) the notice specified as an Reference Obligation a loan facility rather than a particular individual loan; (2) the Reference Obligation identified in the notice was not previously identified by the parties in the applicable agreements and schedules; and (3) the Reference Obligation had expired before the date of the notice.   Indeed, it is undisputed by the Citi Defendants that this notice was defective at least insofar as that the Reference Obligation identified in this notice (the Approved Lyondell Loan) had expired.   See Citi Mem. Opp., 4/5/10, at

_____

[9] In any event, the private placement memorandum accompanying the offering of the Class F Certificates, which the Fund acknowledged receiving and reviewing, expressly advised that CGML had control over the timing of when the valuation window began in that it could choose when to trigger the occurrence of an Event Determination Date upon which the valuation window was based.   PPM at 12.

26.   But notwithstanding this defect, Citi contends that its January 28 substitution notice cured all defects in the January 13 Credit Event Notice.   The Fund disputes this.

According to the Confirmation, "if in the opinion of [CGML] a Credit Event Notice is deficient in that it fails to designate . . . [qualifying] Obligation, [CGML] may deliver a revised Credit Event Notice."  Confirmation, Annex A, at 8.   Thus, the Citi Defendants argue, the Confirmation expressly contemplates that Credit Event Notices that contain some defect in identifying the relevant Obligation can be cured, and consistently with its provision, CGML identified a Substitute Reference Obligation in its January 28 notice.   The Fund responds that the Citi Defendants' "cure" argument falters because of the significance of the date of the Credit Event Notice in setting the valuation window.   According to the Fund, if the Citi Defendants are correct that the January 28 substitution notice constituted a "revised" Credit Event Notice, it would follow that CGML's March 20 valuation with respect to the Lyondell Credit Event was premature, because it took place well before the 45-to-60 business-day window as calculated from the January 28 revised notice. The Citi Defendants reply that there is no reason to conclude, under these facts, that the revision of the Credit Event Notice restarts the valuation clock instead of revising the original notice effective as of the date of that notice.

The Court agrees that the Fund is not entitled to summary judgment on this basis.   While the Confirmation expressly provides for the issuance of a "revised Credit Event Notice" when a Credit

13

Event Notice is deficient in failing to designate a proper Obligation, the terms of the agreements do not specify whether the issuance of a revised notice renders the initial notice effective as of the date that the initial notice was issued.

If, given this ambiguity, extrinsic evidence of the parties' intentions is to be considered, it appears that the Fund's theory that a revised notice must restart the valuation period lacks any grounding in the purposes served by the valuation window: According to the Fund, CGMI requested this valuation window to avoid "noise" generated by the Loan Credit Default Swaps auction that takes place 20-30 calendar days after a default.  Aff. of Levoyd Robinson Re: Citi, 3/26/10, ¶ 28.  According to the Citi Defendants, this valuation period was chosen in order to satisfy the requirements of credit rating agencies, which have defined various periods from the dates of a credit event that they consider to be sufficient for the market to process information resulting from the event.  See Reply Aff. of Rachel E. Cherington, 4/16/10, Exs. 41-43.  Under either of these understandings, the function of the valuation window is tied to the date that the credit event actually takes place, rather than the date that the credit protection buyer sends notice of the credit event.  Thus, the interpretation advanced by Citi has the advantage of being consistent with the purpose behind the valuation window provisions.[10]

---

[10] On the other hand, the Confirmation enables CGML to delay the valuation date until well after the purposes furthered by the valuation window are served, in that CGML may issue a Credit Event Notice with respect to a Credit Event occurring under the

Independently, because the Fund failed to object to the Trustee's payment of the settlement amount with respect to the Lyondell Credit Event on the ground that the valuation was untimely -- or on any other ground having to do with the validity of the January 13 Credit Event notice -- until the filing of the Second Amended Complaint, there is at least a question of fact as to whether the Fund has forfeited its right to assert its technical objection by failing to promptly raise it.  Cf. Rode & Brand v. Kamm Games, Inc., 181 F.2d 584, 587 (2d Cir. 1950) ("a party to a contract may not repudiate the contract on one ground and later assert entirely different grounds as a defense for such refusal to perform").

However, given the lack of clarity in the language of the agreements as to the effect of the issuance of a revised Credit Event Notice on the valuation window, the Court concludes that the narrow issue of whether the Lyondell valuation was timely given the issuance of a revised Credit Event Notice cannot be resolved in the Citi Defendants' favor without the consideration of extrinsic evidence of the parties' intentions, and accordingly denies their cross-motion on this point.  See, e.g., Palmieri v. Allstate Ins. Co., 445 F.3d 179, 188 (2d Cir. 2006) ("Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an

---

swap up until two weeks after the scheduled termination of the swap in 2011.  Citi 56.1 ¶ 69.

15

issue of fact and summary judgment is inappropriate." (internal quotation marks omitted)).[11]

Apart from these more technical objections, the Fund challenges the substance of CGML's designation of the Substituted Lyondell Loan as the Reference Obligation with respect to which the loss protection payment was calculated following the Lyondell Credit Event. This contention requires consideration of the rather complex procedures for substituting a Reference Obligation under the swap.

As noted, the original Reference Portfolio under the swap consisted of 71 Reference Entities and their corresponding Reference Obligations. Citi 56.1 ¶ 59. The Confirmation provides that if a particular Reference Obligation identified in the Confirmation had been paid off or refinanced, then CGML, as "Calculation Agent" under the swap, may in certain circumstances substitute into the Reference Portfolio a new Reference Obligation provided that that loan meets certain criteria. Id. ¶ 44. The four relevant criteria are underscored below:

> [A]ny Substitute Reference Obligation shall be a Loan that
> (i) in the reasonable opinion of the Calculation Agent,
> satisfies the Senior Secured characteristic as of the day on
> which it is identified as a Substitute Reference Obligation,
> (ii) ranks pari passu . . . in priority of payment with the
> then-current Reference Obligation . . . (with the ranking in
> priority of payment of the then-current Reference Obligation
> being determined as of the later of (A) the Trade Date
> specified in the related Confirmation and (B) the date
> on which the then-current Reference Obligation was issued or
> incurred and not reflecting any change to such ranking in

---

[11] The Court notes also that there is no evidence in the summary judgment record of what damages, if any, the Fund suffered as a result of the allegedly premature valuation of the Lyondell Credit Event.

16

priority of payment after such later date) . . . , (iii)
<u>preserves the economic equivalent</u>, as closely as practicable
as determined by the Calculation Agent in consultation with
the parties, of the delivery and payment obligations of the
parties to the Credit Derivative Transaction and (iv) <u>is a
Loan of the Reference Entity</u>. . . . Promptly upon identifying
a Loan as a Substitute Reference Obligation (the "Proposed
Substitute Reference Obligation"), the Calculation Agent
shall provide notice to each party and such identification
shall be binding upon the parties as to the Senior Secured
Obligation Characteristic absent manifest error.

Confirmation, Annex A, at 9 (emphasis added).  The Confirmation

defines "Senior Secured" to mean:

as of any date of determination, that the Obligation is
secured by a First Lien.

"First Lien" means a security interest, or the
application of proceeds realized following the enforcement of
a security interest, in collateral, (i) which by its terms is
not subordinated to the security interest of any other
person, and (ii) with respect to which the secured party has
not entered into an agreement to subordinate such security
interest to the security interest of any other person.

<u>Id.</u> at 8-9.  The ISDA Definitions further provide:

For purposes of determining whether Subordination
exists or whether an obligation is Subordinated with respect
to another obligation to which it is being compared, the
existence of preferred creditors arising by operation of law
or of collateral, credit support or other credit enhancement
arrangements shall not be taken into account . . . .

ISDA Defs. § 2.19(b)(1)(B).[12]

---

[12] The Confirmation also contains 13 pages of provisions
with respect to the "replacement" of Reference <u>Entities</u>.
Confirmation, Annex A, Ex. I.  These provisions are not directly
relevant to the instant motions.  The Citi Defendants, however,
urge the Court to draw the inference that the relative complexity
of the Confirmation's provisions regarding the replacement of
Reference Entities, as opposed to its relatively concise
provisions regarding the substitution of Reference Obligations,
indicates that the latter provisions were relatively unimportant
to the parties in negotiating this transaction.

In addition to those noted above, the facts relevant to the substitution of the Lyondell Reference Obligation are the following. Loan LN287481, which both the Fund and the Citi Defendants intended to designate as the Lyondell Reference Obligation, was secured by, among other things, a first lien on certain of Lyondell's cash, accounts receivable, and inventory, and was also secured by Lyondell's plants, property, and equipment ("PP&E").  Pl's 56.1 Re: Citi ¶¶ 94-95.  According to the Fund, it selected this loan in part because it was secured by a first lien on high-quality collateral and because the Fund discounted the value of Lyondell's PP&E, which were subject to environmental remediation liabilities.  Id. ¶¶ 96-98.  As part of Lyondell's December 2007 merger with Basell, all of Lyondell's loans were paid off and replaced with $12.7 billion in new debt.  Id. ¶ 103.  CGMI was one of the joint lead arrangers for this merger.  Id. ¶ 116.

The new debt issued in connection with the merger included, among other things, a five-year $1 billion asset-backed revolving credit facility, later increased to $1.6 billion, which is secured by a first lien on cash, accounts receivable, and inventory, and which the Fund has denominated in its papers as the "Equivalent LCC [i.e., Lyondell] Loan."  Id. ¶¶ 104-06.  This new debt also included a facility comprising six loans secured in part by a first lien on PP&E, which the Fund has tendentiously dubbed "Toxic LLC Loans."  Id. ¶¶ 107-08.  Whereas the Equivalent LCC Loan was syndicated at the time of the Lyondell-Basell merger, the Toxic LLC loans were not, but rather were restructured into several tranches to aid in syndication.

18

Id. ¶¶ 110-12.  A loan from one of these tranches (Bloomberg Number LN385221) is the Substituted Lyondell Loan.  Id. ¶ 113.

Lyondell and its domestic subsidiaries and affiliates filed for Chapter 11 bankruptcy protection on January 6, 2009, and that same day, the debtors sought an order to approve more than $8 million in DIP financing.  Id. ¶¶ 118-19.  The DIP financing consisted of a $1.5 billion asset-backed revolver, a $3.25 billion new money term loan, and a $3.25 billion "roll-up" term loan.  Id. ¶ 120.  Citi was one of the arrangers and lenders with respect to Lyondell's DIP financing package, which was set forth in a term sheet executed by Citi and several other arrangers of this financing.  Id. ¶¶ 127-28.  On January 8, 2009, the Bankruptcy Court entered an interim order authorizing the DIP financing.  Id. ¶ 122.  Pursuant to 11 U.S.C. § 364(c)(1), this order had the effect of, among other things, granting these DIP loans "superpriority" status relative to prepetition loans.  Additionally, the interim order supplemented the liens of prepetition lenders with so-called "adequate protection" liens in order to protect against diminution in the value of these lenders' collateral as a result of the "priming" of their liens.  Thus, following the entry of this interim order, the Substituted Lyondell Loan had become subordinated to the $8 billion of DIP financing.  Id. ¶ 123.  The Bankruptcy Court provided final approval of the DIP financing on March 1, 2009.  Id. ¶ 125.

As noted, on January 28, 2009, CGML sent the substitution notice designating the Substituted LLC Loan as the Substitute Reference Obligation.  The Fund objected to this notice on the same

day, and throughout the next two months until the settlement payment
was eventually made, the Fund, the Citi Defendants, and the Trustee
disputed the propriety of this substitution.  See, e.g., SAC ¶¶ 99-
108, Citi Ans. ¶¶ 99-108; Cherington Decl., Ex. 23.

        In its summary judgment motion against the Citi Defendants,
the Fund contends that the substitution of the Substituted Lyondell
Loan was invalid because it failed to comply with three of the
Substitute Reference Obligation criteria, which are that the
substituted loan (1) in the reasonable opinion of CGML, satisfies the
"Senior Secured" characteristic; (2) ranks pari passu in priority of
payment with the Approved Lyondell Loan; and (3) preserves the
economic equivalent, as closely as practicable as determined by CGML
"in consultation with the parties," of the parties' obligations under
the transaction.

        The parties' arguments as to the first two of these criteria
essentially reduce to the question of whether the subordination of a
loan that occurs by way of a Bankruptcy Court's approval of DIP
financing precludes that loan from satisfying the "Senior Secured"
characteristic.  It is undisputed here that the Substituted Lyondell
Loan was, as a factual matter, subordinated to several levels of the
DIP financing and that Citi had agreed to a term sheet proposing
financing that, when approved by the Bankruptcy Court, effected this
subordination.[13]  Thus, to the extent the effects of the DIP financing

_____

        [13] To the extent that the Fund contends that the Substituted
Lyondell Loan was subordinated by the adequate protection liens
approved as part of the DIP financing, that contention appears to
rest on a misunderstanding.  The adequate protection liens

are considered to result in "subordination" within the meaning of the Confirmation, by the terms of the loan or by agreement of the secured party to subordinate, the pari passu characteristic would not be satisfied: the Substituted Lyondell Loan, if considered to be subordinated, would not rank pari passu in priority of payment vis-à-vis the Approved Lyondell Loan as of the May 29, 2007 trade date.

    The Citi Defendants respond, however, that the subordination that occurs by a Bankruptcy Court's approval of DIP financing is disregarded under the swap pursuant to the ISDA Definitions, which are expressly incorporated into the Confirmation.  As noted, these definitions provide that the determination of whether an obligation is "Subordinated" does not take into account "the existence of preferred creditors arising by operation of law."  Thus, the Citi Defendants argue, any subordination that took place through the DIP financing was not by the terms of the Substituted LLC Loan, but rather occurred by operation of the Bankruptcy Code, and, for similar reasons, there was no "agreement to subordinate" by way of Citi's execution of the DIP financing term sheet.  Moreover, the Citi Defendants aver that allowing subordination by way of the Bankruptcy Code to disqualify a loan from "Senior Secured" status would vitiate the purpose of the swap.  This is because DIP financing, which, according to extrinsic evidence submitted by the Citi Defendants, is

_____

granted to the prepetition lenders were in addition to, rather than in lieu of, their prepetition liens, although the prepetition liens were themselves subordinated by the DIP financing.  See Decl. of Kanchana Wangkeo Leung Opp. Citi, 4/5/10, Ex. 71, at 14-15; id. Ex. 72, at 34-35.

common in corporate bankruptcies and typically involves prepetition lenders, automatically primes all pre-petition debt as a matter of law.[14]  Hence, under the Fund's interpretation, it would be difficult, if not impossible, to identify a permissible Reference Obligation with respect to a Reference Entity that filed for bankruptcy (other than the DIP facility itself), which would be at odds with the Confirmation's purpose of providing credit protection in the event a Reference Entity files for bankruptcy or otherwise experiences a Credit Event.

The Fund responds by arguing that the ISDA definition of "Subordination" is <u>not</u> incorporated into the Confirmation's definition of the "Senior Secured/First Lien" Obligation Characteristic because the term "subordinate" in the latter definition is not capitalized and, therefore, does not incorporate a defined term.  Moreover, the ISDA definition of "Subordination" appears as part of the standard definition of the "Not Subordinated" Obligation Characteristic, 2003 ISDA Defs. § 2.19(b)(1)(A), which, the Fund argues, was rejected in favor of the customized Senior Secured Obligation Characteristic negotiated by the parties.  The

---

[14] This evidence of industry customs and usages is potentially relevant to the threshold question of whether these contractual provisions are ambiguous, which is an issue of law that the Court may determine on summary judgment.  <u>See</u> <u>Eternity</u> <u>Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.</u>, 375 F.3d 168, 173 (2d Cir. 2004) ("An ambiguity exists where the terms of a contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement <u>and who</u> <u>is cognizant of the customs, practices, usages and terminology as</u> <u>generally understood in the particular trade or business</u>.'" (internal quotation marks omitted) (emphasis added)).

Fund also contends that the subordination that occurred here did not occur "by operation of law" (i.e., the Bankruptcy Code), but rather took place because of an agreement reached by the DIP lenders.  And the Fund asserts that its interpretation is consistent with one of the purposes of the Senior Secured/First Lien characteristic, which is to remove any incentive of a secured creditor/credit protection buyer to devalue a loan on which it can claim credit protection.[15]

Having carefully considered these arguments, the Court is of the conclusion that this issue cannot be resolved on summary judgment.  While the ISDA Definitions clearly exclude subordination by operation of law from the "Not Subordinated" characteristic, it is at best ambiguous -- even after taking the evidence of industry custom and usage into account -- whether this definition of subordination is incorporated into the Senior Secured/First Lien characteristic that was negotiated by the parties.  Even assuming that this definition is incorporated, it is unclear whether the

_____

[15] The Fund also argues that CGML could have avoided this predicament by identifying a Substitute Reference Obligation for the Approved Lyondell Loan well before Lyondell's bankruptcy filing.  It is far from clear, however, whether this would have helped, because the Credit Event Notice must specify an Obligation that "in the reasonable opinion of the Calculation Agent satisfies the Senior Secured Obligation Characteristic," Confirmation, Annex A, at 8, and the "relevant day for determining whether the Senior Secured characteristic is satisfied is . . . for the purpose of determining whether a Reference Obligation satisfies the Senior Secured Obligation Characteristic, on the Event Determination Date," id. at 9, i.e., the date that a valid Credit Event Notice is issued, see ISDA Defs. § 1.8.  Thus, even if Lyondell had identified the Substituted Lyondell Loan prior to Lyondell's Credit Event, it appears that the Fund still would have objected as long as it believed that loan did not satisfy the Senior Secured characteristic as of the Event Determination Date.

subordination that occurs pursuant to a Bankruptcy Court's approval of DIP financing proposed by DIP lenders is tantamount to subordination "by operation of law."  To be sure, the Citi Defendants appear to be correct that the interpretation of "subordination" urged by the Fund would severely restrict the substitution of Reference Obligations following a bankruptcy, but the Court cannot conclude on summary judgment that this practical consequence would render meaningless the swap's provisions regarding the designation of Reference Obligations and the means of calculating the amount of a loss protection payment following the occurrence of a Credit Event. For the foregoing reasons, the Court hereby denies the parties' summary judgment motions with respect to whether CGML properly determined that the Substituted Lyondell Loan satisfied the <u>pari passu</u> characteristic.

For similar reasons, summary judgment cannot be granted with respect to the Senior Secured characteristic, which under the Confirmation's provisions regarding substitutions of Reference Obligations, needs to be satisfied only in the "reasonable opinion" of the Calculation Agent and is binding absent manifest error. Insofar as the Citi Defendants have created an issue for trial with respect to whether subordination due to DIP financing should be disregarded under the swap, it follows that CGML could in its reasonable opinion conclude accordingly and that doing so would not be manifest error.[16]

---

[16] The Fund claims that there is no evidence that CGML ever formed a reasonable opinion as to whether the criteria for

The Fund also raises a procedural challenge to CGML's determination that the Substituted Lyondell Loan satisfied the economic equivalence criterion.  It contends that the Citi Defendants failed to comply with the Confirmation's requirement that it determine economic equivalence "in consultation with the parties" in that there was no consultation at all prior to sending the January notices.  The Citi Defendants respond as an initial matter that their obligation to consult with the "parties" extends only to consultation with the Trustee, who they contend is the sole counterparty under the Confirmation.  This argument, however, is of limited force, given that there is no evidence of pre-substitution consultation with the Trustee.  But even assuming that the consultation obligation extends to the Fund as well as (or in lieu of) the Trustee, the Citi Defendants urge that the terms of the Confirmation contemplate that "consultation" takes place following an initial identification of a Substitute Reference Obligation.  This is because the Confirmation requires that "[p]romptly upon identifying a Loan as a Substitute Reference Obligation (the 'Proposed Substitute Reference

---

substitution were satisfied, as the testimony of certain employees of the Citi Defendants, taken most favorably to the Fund, indicates that CGML relied on improper indicia of "senior secured" status rather than consulting the relevant credit agreements, as required under the Confirmation.  See Pl's 56.1 Re: Citi ¶¶ 155-58, 164-67.  There is, however, deposition testimony indicating that a CGML employee at the very least identified the credit agreement for the Substituted Lyondell Loan.  Decl. of M. Eileen O'Connor, 4/5/10, Ex. 13 (Dep. of Michael W. Cooney, 1/5/10), at 159-160.  In any event, the Court need not reach the process by which CGML made this determination given the genuine issue of material fact as to whether this determination was substantively reasonable and not manifestly erroneous.

Obligation'), the Calculation Agent shall provide notice to each party." Confirmation, Annex A, at 9. This notion of a Proposed Substitute Reference Obligation, the Citi Defendants maintain, suggests that the consultation is not required to occur until the notice of a proposed substitute is sent and may take place up until the Calculation Agent makes its determination of economic equivalence.

The Fund responds that the ISDA Definitions, unlike the terms of the Confirmation itself, provide that "the Calculation Agent shall (after consultation with the parties) identify one or more Obligations to replace such Reference Obligations." ISDA Defs. § 2.30(a). However, Annex A to the Confirmation, which contains the language requiring only that the economic equivalence determination be made "in consultation with the parties," controls to the extent it is inconsistent with the 2003 Definitions, see Confirmation, Annex A, at 1. Thus, the interpretation offered by the Fund would render superfluous the Confirmation's introduction of the concept of a Proposed Substitute Reference Obligation and the requirement that CGML send notice upon identification thereof.

While the Court is of the tentative view that consultation may indeed take place following the identification of the Proposed Substitute Reference Obligation, it ultimately need not reach this issue, because the evidence here shows that CGML discharged whatever obligation it had to consult with the Fund even accepting the Fund's position that consultation must take place prior to sending the substitution notice. This is because Levoyd Robinson, the Fund's

Managing Principal, testified at his deposition that he had spoken
with Adam Bentch (a CGMI employee) the week before he received the
January 28 notice regarding the Lyondell Credit Event.   Robinson
testified:

> I asked them what are they going to do about Lyondell because
> it's expired, and the only thing that's out there that's
> eligible is the asset base [_i.e._, the asset-backed revolver
> referred to by the Fund as the Equivalent LCC Loan].   He
> responded, if that's the case, that's fine.   And then I get
> this -- this substitute.

Cherington Decl., Ex. 12 (Dep. of Levoyd Robinson, 12/8/09 ("Robinson
Dep.")), at 163-64.   This testimony indicates that the Fund was aware
that the Approved Lyondell Loan had expired and conveyed its view as
to the only loan that, in its opinion, was an appropriate Substitute
Reference Obligation.   Although the Fund contends that this exchange
did not amount to a consultation because there was no specific
discussion of the Substituted Lyondell Loan, the Court finds this
distinction to be immaterial.   Any conceivable purpose behind the
consultation requirement was fully satisfied once the Fund had the
opportunity, prior to the identification of a Proposed Substitute
Reference Obligation, to make known its views on economic
equivalence.   Indeed, the issue of economic equivalence with respect
to the Lyondell substitution was vigorously debated among the parties
in the months between the January 28 notice and the March 20
settlement.   For these reasons, the Court can identify no genuine
issue of material fact as to whether the duty of CGML to consult with
respect to economic equivalence was satisfied, and accordingly grants
the Citi Defendants' motion in this respect.

This leaves the issue of whether the Substituted Lyondell Loan "preserves the economic equivalent, as closely as practicable" (as determined by the Calculation Agent), of the parties' delivery and payment obligations under the swap. This issue, on its face, requires the resolution of material factual disputes, especially in the context of the changes in Lyondell's capital structure as a result of the Basell merger and Lyondell's bankruptcy. Indeed, none of the parties contends that this issue can be resolved as a matter of law on the undisputed facts. For that reason, the issue of economic equivalence with respect to the Lyondell substitution cannot be resolved on summary judgment.

Turning next to those aspects of the Fund's claims against the Citi Defendants that relate to the Charter and Idearc credit events, the relevant facts are as follows. Charter and Idearc filed for bankruptcy in March 2009. Pl's 56.1 Re: Citi ¶ 172. On April 1, 2009, CGML issued Credit Event Notices for each of these entities. Id. ¶ 173; see also Cherington Decl., Exs. 15 (Charter notice) & 16 (Idearc notice). On June 4, 2009, CGML sent the Trust separate notices stating a final settlement price for the Charter and Idearc Reference Obligations using a valuation date of June 3. Pl's 56.1 Re: Citi ¶ 175. The parties agree, however, that the 45-to-60 "Business Day" window following the April 1 Event Determination date did not begin until June 9, 2009; CGML selected June 3 as a valuation date because it failed to account for several New York and London bank holidays in its day count. Id. ¶¶ 174-75, 181.

It is undisputed that the Fund knew of the day count error by
June 23, 2009.  Citi 56.1 ¶ 118.  The Citi Defendants contend that
they were not informed of the day count error until July 16.  Id.
The Fund's general counsel, S. Jay Novatney, testified that he called
U.S. Bank regarding the day count immediately after the Fund received
copies of the valuation notices on June 23, 2009, but that, at that
point, U.S. Bank had already paid the settlement amounts for Charter
and Idearc based upon the valuation notices.  Id. ¶¶ 178, 179.
Following the Fund's written objections to the validity of these
valuations, CGML submitted "amended valuation notices," which
contained valuations using historical pricing data provided by a
third-party pricing service.  Id. ¶ 182; see also Cherington Decl.,
Ex. 20.  U.S. Bank accepted the amended valuation notices over the
Fund's objection, Citi 56.1 ¶¶ 185-86, and Citi returned $458,160 to
adjust for the final price based on the corrected valuation date,
Cherington Decl., Ex. 11, ¶ 19.

The Fund moves for summary judgment declaring that CGML's
valuations of Charter and Idearc are entirely invalid and awarding
the recovery of the over $6 million paid by the Trust in connection
with the Charter and Idearc credit events.  It is undisputed, as
noted, that the initial valuations came before the 45-to-60 business
day window as defined by the swap agreements.  The Citi Defendants
argue that returning to the Funds the entire $6 million amount of the
loss protection payments paid with respect to these credit events
merely because of this technical breach would be completely contrary
to the economic purpose of the Confirmation, which was to provide

credit protection when a Reference Entity undergoes a Credit Event.
They contend that the Fund delayed in notifying them of the day count
error until after the proper valuation window had already closed.
Moreover, they assert that the pricing methodology that CGML used to
correct the valuation error generates pricing more favorable to the
Fund than would have resulted had actual dealer bids been solicited,
and posit that the Fund has come forward with no evidence to the
contrary.

    The Court can identify no reason to permit the Fund to be
relieved entirely of its obligation to provide credit protection
following the Charter and Idearc bankruptcies merely because the Citi
Defendants failed to account for certain banking holidays in setting
the valuation window.  Even assuming that the Fund has created a
genuine factual dispute as to whether the call from Novatney put the
defendants on notice of the day count discrepancy as of June 23,
2009, there is no basis for completely invalidating the settlement
payments because of this error.  The Fund's position with respect to
these valuations is incompatible with the well-established doctrine
of forfeiture, whereby "[t]o the extent that the non-occurrence of a
condition would cause disproportionate forfeiture, a court may excuse
the non-occurrence of that condition unless its occurrence was a
material part of the agreed exchange."  Restatement (Second) of
Contracts § 229; see also Wuhan Airlines v. Air Alaska, Inc., 1998 WL
689957, at *3 (S.D.N.Y. Oct. 2, 1998) ("In Cardozo's famous
formulation of the role of common sense in contract construction,
'The law has outgrown its primitive stage of formalism when the

precise word was the sovereign talisman, and every slip was fatal.'" (quoting <u>Wood v. Duff-Gordon</u>, 222 N.Y. 88, 91 (1917))). There is absolutely no indication from the terms of the swap agreements that an error of a few days based on a failure to account for bank holidays was the sort of material breach that should result in a complete forfeiture by the protection buyer with respect to the credit event at issue. For these reasons, the Court holds as a matter of law that the Fund is not entitled to the wholesale invalidation of the settlement payments made with respect to the Charter and Idearc credit events.[17]

That said, there is no dispute that the Charter and Idearc Violations were several days premature and that CGML's amended valuation notices rely on a pricing methodology that is not authorized under the swap agreements. While the Fund's summary judgment papers provide no basis for the Court to conclude that it suffered actual damages from the valuation error when the $458,160 cure payment is taken into account, the Court will permit the Fund to attempt to make this showing at trial, and accordingly denies the Citi Defendants' summary judgment motion to that limited extent.

The Fund's final set of claims against the Citi Defendants have to do with a number of substitutions of Reference Obligations that CGML effectuated in May and August 2009. On May 15, 2009, CGML

---

[17] In addition, as noted, the record evidence indicates that the purpose of the 45-to-60 business-day valuation window was to ensure the integrity of the market pricing of the Reference Obligation on the valuation date, not to set a trap for CGML. There is no evidence that CGML's counting error was intentional or was made for any malicious purpose.

delivered a notice indicating that it substituted 26 Reference Obligations with respect to the Reference Entities in the Reference Portfolio.  Pl's 56.1 Re: Citi ¶ 187; <u>see also</u> Leung Citi Decl., Ex. 23.  In August 2009, CGML substituted another five loans.  Pl's 56.1 Re: Citi ¶ 188; <u>see also</u> Leung Citi Decl., Ex. 30.  The Fund objected to CGML's August substitution by letter dated August 26, 2009.  Pl's 56.1 Re: Citi ¶ 189; <u>see also</u> Leung Citi Decl., Ex. 32.  CGML did not consult with the Fund or U.S. Bank prior to sending these notices. Pl's 56.1 Re: Citi ¶ 190.  CGML asserts that it made these substitutions because it determined, given the Fund's actions with respect to the Lyondell substitution, that it would be wise to review Reference Obligations and identify substitutes for those that had expired.  <u>See</u> Cherington Decl., Ex. 21 (Dep. of Michael W. Cooney, 12/1/09), at 104.

Based on its view that consultation with respect to a Substituted Reference Obligation's economic equivalence must take place prior to the issuance of the notice of substitution, the Fund moves for summary judgment granting declaratory relief holding that these substitutions are invalid due to the lack of timely consultation.  As the Fund recognizes, however, the Court's decision to grant declaratory relief is a discretionary one, and is based on considerations such as whether "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue." <u>Dow Jones & Co., Inc. v. Harrods, Ltd.</u>, 237 F. Supp. 2d 394, 432 (S.D.N.Y. 2002) (internal quotation marks omitted).  The Court concludes that the alleged failure to consult with respect to the May

and August substitutions is not the sort of dispute that merits the exercise of such discretion. Whatever the contours of the Fund's consultation right are, this obligation itself is relatively insignificant in the overall context of the swap agreement, as it pertains only to the economic equivalence criterion for substitution but not to the other three criteria or any other aspect of the transaction. Moreover, unlike its more particularized objections to the Substituted Lyondell Loan, the Fund makes no claim that any of the substituted loans included in the May and August substitutions do not satisfy the economic equivalence criterion, far less that it has identified alternative eligible substitute loans that are more economically equivalent that would be the subject of a "consultation." Absent any indication that the Fund, if consulted, would have objected to any of the substitutions noticed by CGML, the Court concludes that the parties' competing interpretations regarding the consultation right do not present the type of issue for which a declaratory judgment would serve a useful purpose. Accordingly, the Citi Defendants' motion for summary judgment dismissing such claims is hereby granted.

As noted, the Citi Defendants have interposed three counterclaims against the Fund, and the parties cross-move for summary judgment with respect to these counterclaims. The counterclaims all arise from allegations that by bringing this litigation, the Fund has in effect petitioned for the liquidation of the Trust, thus entitling CGML to various forms of relief under the swap agreements.

The counterclaims arise from the following facts.  The Fund's Second Amended Complaint, like the Fund's previous two complaints, seeks a judgment declaring that the swap agreement terminated as of January 28, 2009, because the Citi Defendants failed to pay the full premium due on account of the challenged settlement payments, and directing U.S. Bank to return the amount maintained in its cash reserve as of that date.  Second Am. Compl., p. 77.  In the Fund's Rule 30(b)(6) deposition, Levoyd Robinson, the Fund's managing principal, answered "Yes" to the question, "Am I correct that you essentially want to liquidate the assets of the trust at this point in the litigation?".  Robinson Dep. at 371-72.

Against this factual background, the Citi Defendants bring their counterclaims based on the following provisions of the swap and related agreements.  The ISDA Master Agreement defines an Event of Default as follows:

> The occurrence at any time with respect to a party . . . of any of the following events constitutes an event of default (an "Event of Default") with respect to such party: . . . (vii) <u>Bankruptcy.</u>  The party . . . (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, <u>or a petition is presented for its winding-up or liquidation, and</u>, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) <u>is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution</u> or presentation thereof; (5) has a resolution passed for its winding-up,

official management or liquidation (other than pursuant to a
consolidation, amalgamation or merger); (6) becomes subject
to the appointment of an administrator, provisional
liquidator, conservator, receiver or other similar official
for it or for substantially all its assets; (8) causes or is
subject to any event with respect to it which, under the
applicable laws of any jurisdiction, has an analogous effect
to any of the events specified in clauses (1) to (6)
(inclusive).

Confirmation, Annex B (ISDA Master Agreement) § 5(a)(vii) (emphasis

added); <u>see also</u> Leung Decl., Ex. 1C (Confirmation, Annex C).  The

Master Agreement also provides that "[i]f at any time an Event of

Default with respect to a party (the 'Defaulting Party') has occurred

and is then continuing, the other party (the 'Non-defaulting Party')

may . . . designate . . . an Early Termination Date."  Confirmation,

Annex B, § 6(a).  In a representation letter executed in connection

with the Fund's purchase of Class F Certificates, the Fund

represented as follows:

> The Purchaser, by its acceptance of a Certificate, covenants
> and agrees that [the Purchaser] shall not, prior to the date
> which is one year and one day after the termination of the
> Trust Agreement, acquiesce, petition or <u>otherwise invoke</u> or
> cause the Depositor to invoke <u>the process of any court</u> or
> governmental authority <u>for the purpose of commencing or
> sustaining a case against the Depositor [CGMI], the Trustee
> or the Trust</u> under any federal or state bankruptcy,
> insolvency, reorganization or similar law or appointing a
> receiver, liquidator, assignee, trustee, custodian,
> sequestrator or other similar official of the Depositor, the
> Trustee or the Trust or any substantial part of its property,
> <u>or ordering the winding up or liquidation of the affairs of
> the Depositor, the Trustee or the Trust</u>.

Cherington Decl., Ex. 13 (Purchaser Representation Letter), ¶ 21

(emphasis added).  Similarly, under Section 24(u) of the Master Trust

Agreement, each purchaser of a Class F certificate or a beneficial

interest therein is deemed to represent that it

covenants and agrees that the Purchaser shall not, prior to
the date which is one year and one day after the termination
of the Trust Agreement, acquiesce, petition or otherwise
invoke or cause the Depositor to <u>invoke the process of any
court</u> or governmental authority <u>for the purpose of commencing
or sustaining a case against the Depositor [CGMI], the
Trustee or the Trust</u> under any federal or state bankruptcy,
insolvency, reorganization or similar law or appointing a
receiver, liquidator, assignee, trustee, custodian,
sequestrator or other similar official of the Depositor, the
Trustee or the Trust or any substantial part of its property,
or <u>ordering the winding up or liquidation of the affairs of
the Depositor, the Trustee or the Trust</u>.

<u>Id.</u> Ex. 6, MTAS, § 24(u) (emphasis added).

Based on the underscored portions of these provisions, the
Citi Defendants contend that the Fund has petitioned for the Trust's
liquidation or otherwise invoked judicial process for the purpose of
liquidating or winding up the Trust, that such a petition has been
pending for over thirty days, and that as a result, an Event of
Default has occurred and the representation letter and Master Trust
Agreement have been breached, thus entitling the Citi Defendants to
various forms of relief.

The Citi Defendants are correct, as a superficial matter,
that some of the relief sought by the Fund through this lawsuit
resembles liquidation.  The Term Asset is the Trust's primary asset,
<u>see</u> PPM at 20, and if the Fund prevails in its position that the Citi
Defendants committed an Event of Default by failing to make the
required settlement payments, the Fund, as the "Non-defaulting
Party," would have the right to designate an "Early Termination
Date," Confirmation, Annex B, § 6(a), thus terminating the Trust on
that date.  It is apparent, however, that the portions of the swap
agreements relied upon by the Citi Defendants with respect to their

36

counterclaims are addressed to bankruptcy petitions or other similar insolvency proceedings, rather than the claims for breach of contract asserted by the Fund in this lawsuit.  The fact that the Fund's 30(b)(6) witness agreed to the Citi Defendants' counsel's characterization of this lawsuit as seeking "liquidation" cannot change the fact that the provisions of the ISDA Master Agreement, representation letter, and Master Trust Agreement relied upon by the Citi Defendants clearly contemplate petitions filed under the bankruptcy laws, far different from what is presented here.[18]  The interpretation urged by Citi would have the effect of turning any action by the Fund to address an alleged breach of the swap terms into an Event of Default by the protection seller, thus chilling the ability of the Fund to vindicate its rights under the swap where, as here, the Trustee has allegedly failed to protect the Fund's interests.[19]  Because the Court concludes that the Citi Defendants' counterclaims rest on the legally untenable proposition that the instant lawsuit is the functional equivalent of a "petition" for "liquidation" or "winding up," the Court hereby grants the Fund

---

[18] Thus, the Court need not address the Fund's objection that this testimony fell outside the scope of Robinson's Rule 30(b)(6) deposition notice.

[19] Additionally, it would be incongruous to conclude that the Fund's bringing of this lawsuit amounts to an Event of Default when the Fund alleges in the Eighth Claim of its Second Amended Complaint that CGML has itself defaulted by failing to make the full amount of premium payments (because of allegedly improper valuation notices and settlement payments), and the Court concludes that this claim presents genuine issues of material fact.

summary judgment in this respect and hereby dismisses the three counterclaims.

Next, the Court addresses the cross-motions for summary judgment filed with respect to the actions taken by U.S. Bank as Trustee.  The facts relevant to these motions are as follows.  As noted, CGMI requested that this credit default swap transaction be structured as a credit-linked note issued by a trust pursuant to Citi's proprietary "Beach Street" trust structure.  Pl's 56.1 Re: U.S. Bank ¶¶ 11-14.  The substantive terms of this transaction were negotiated between the Citi Defendants and the Fund.  U.S. Bank 56.1 ¶ 8.  CGMI and the Fund agreed that U.S. Bank would serve as Trustee for the Trust, but the Fund did not communicate with U.S. Bank concerning the transaction prior to its closing.  Id. ¶¶ 10, 12.  The Fund did not review the Base Trust Agreement or the Series Trust Instrument prior to the day of the closing.  Id. ¶ 14.  The Fund did not negotiate any provisions of the trust agreements directly with U.S. Bank.  Id. ¶ 15.

The following facts relate to U.S. Bank's actions taken with respect to the aforementioned credit events and valuations that gave rise to this litigation.  After receiving the January 13, 2009 Lyondell Credit Event Notice, U.S. Bank forwarded this notice to DTC on January 14.  Id. ¶ 36.  Similarly, U.S. Bank promptly forwarded the DTC the January 28, 2009 notice of substitution with respect to the Lyondell Reference Obligation.  Id. ¶ 37.  On January 30, the Fund sent U.S. Bank a letter disputing the validity of that substitution, and thereafter, U.S. Bank requested that CGML explain

why it believed that substitution was permissible.  <u>Id.</u> ¶ 38; <u>see</u> <u>also</u> Decl. of Michael S. Kraut, 3/12/[10] ("Kraut Decl."), Ex. 55 (Dep. of Marlene J. Fahey, 1/5/10 ("Fahey Dep.")), at 267.  CGML sent a letter explaining its substitution on February 11.  U.S. Bank 56.1 ¶ 38; <u>see also</u> Kraut Decl., Ex. 14.  After consulting with outside counsel, U.S. Bank ultimately concluded that the substitution was proper.  <u>See</u> Kraut Decl., Ex. 20.  U.S. Bank then sought and obtained an indemnification agreement from CGML, which recited that U.S. Bank requested the indemnification to hold U.S. Bank harmless so that U.S. Bank could act consistently with CGML's position with respect to the substitution.  <u>Id.</u> Ex. 44. The indemnification agreement was executed on March 20, and, that same day, U.S. Bank liquidated a portion of the Term Asset and made a settlement payment following the receipt of a valuation notice from CGML.  U.S. Bank 56.1 ¶ 41.  On April 3, the Fund's counsel wrote to U.S. Bank to give notice of CGML's alleged breach of the swap agreements, requested that U.S. Bank initiate an action against CGML, and offered U.S. Bank an indemnification to do so.  Pl's 56.1 Re: U.S. Bank ¶ 156; <u>see also</u> Kraut Decl., Ex. 46. U.S. Bank rejected this proposal by letter dated April 14, which noted that the Trustee concluded that CGML acted appropriately in substituting the Lyondell Substituted Reference Obligation.  Pl's 56.1 Re: U.S. Bank ¶ 157; <u>see also</u> Decl. of Kanchana Wangkeo Leung re: U.S. Bank, 3/12/10, Ex. 94.

Next, as to the Charter and Idearc bankruptcies, U.S. Bank promptly forwarded the credit event notices to DTC.  U.S. Bank

39

56.1 ¶¶ 44-46.[20]  On June 4, 2009, CGML sent valuation notices for
these credit events to U.S. Bank, which forwarded them to DTC.  Id.
¶¶ 46-47.  U.S. Bank accepted the notices and paid CGML over $6
million to settle the trade.  Pl's 56.1 Re: U.S. Bank ¶ 168.  After
the Fund objected to the timing of the valuations, CGML responded by
submitting amended valuation notices dated July 27, 2009, and the
Fund sent U.S. Bank a letter on July 28 objecting to the nature of
CGML's proposed revaluation.  Id. ¶ 177.  After conferring with
counsel, U.S. Bank sent CGML a letter on July 28 acknowledging
receipt of the amended notices, applying the corrected amounts, and
reserving its rights as to any errors CGML may have made.  Kraut
Decl., Ex. 34.[21]

In its summary judgment motion against U.S. Bank, the Fund
contends that U.S. Bank violated its contractual obligations and
fiduciary duties as Trustee.  The gist of the Fund's position is that
it believed and reasonably understood that U.S. Bank, by "stepping
into the Fund's shoes" as protection seller under the swap agreement,

---

[20] Prior to issuing the Charter credit event notice, CGML
sent a notice substituting the Charter Reference Obligation that
was in the Reference Portfolio.  In connection with accepting
this substitution notice, U.S. Bank sought and obtained an
indemnification agreement from CGML in the amount of $6 million.
Pl's 56.1 Re: U.S. Bank ¶ 163; see also Kraut Decl., Ex. 45.
While the Fund argues that this indemnification is yet another
indication of U.S. Bank's alleged breaches of contractual and
fiduciary duties as trustee, the Fund does not appear to contest
the substantive validity of CGML's Charter substitution in this
litigation.

[21] Given the Court's ruling that the May and August
substitutions do not present issues fit for declaratory judgment,
the Court does not discuss U.S. Bank's role with respect to these
substitutions.

would assume substantive responsibilities to enforce the Fund's
rights.  This argument relies primarily on the terms of the trust
agreements,[22] which, the Fund contends, make clear that U.S. Bank's
responsibilities are substantive in nature.  For example, there are
numerous provisions of the trust agreements indicating that U.S. Bank
was to discharge its responsibilities "for the benefit of the holders
of the Certificates," i.e., the Fund.[23]  See, e.g., Cherington Decl.,
Ex. 7 (BTA) § 2.2(c) ("The terms and conditions of this Agreement
shall inure for the benefit of and be binding on each Certificate
holder and all persons claiming through or under it (including all
persons on whose behalf such Certificate holder holds Certificates)
as if each Certificate holder and other such persons had been a party
to and had executed this Agreement . . . ."); id. § 3.1(a) (Trustee
"shall administer the Term Assets and any Credit Swap for each given
Trust for the benefit of the Certificateholders of the related
Series"); id. Ex. 6, MTAS § 12(a) ("The Trust is constituted solely
for the purpose of . . . enforcing the Trustee's rights under the
Term Assets, the Base Trust Agreement, the Series Supplement and the
Credit Default Swap . . . ."); id. § 2(a) (Trust was created "for the
benefit of the holders of the Certificates").  In addition, a number

---

[22] Although the Trust was created under Cayman Islands law,
the summary judgment briefing relies on New York law, and no
party contends that Cayman law differs from New York law in any
respect material to these motions.

[23] For purposes of this discussion, the Court assumes
arguendo that the Fund, as sole beneficial owner of the Class F
Certificates, is in all relevant respects treated as a "holder"
of Certificates, even though the nominal record owner is DTC.

of provisions limit U.S. Bank's authority to take actions other than those specified in the trust agreements.  <u>See, e.g.</u>, MTAS § 12(a); BTA § 8.13.  Based on these provisions, the Fund claims that by taking the Citi Defendants' side with respect to the disputed credit events and valuations, U.S. Bank breached these provisions of the trust agreements and its fiduciary duties thereunder.

      U.S. Bank does not contest that the aforementioned provisions required it to administer the Trust for the benefit of the Fund. U.S. Bank argues, however, that the terms of these agreements, read in the context of the Beach Street transaction generally and well-established law on the nature of the duties of indenture trustees, require U.S. Bank to perform only limited, ministerial responsibilities as Trustee, which it properly discharged.  For the following reasons, the Court agrees with U.S. Bank's position and accordingly grants its motion for summary judgment.

      Cases from the Second Circuit and New York State courts have recognized the limited nature of the duties of an indenture trustee: "An indenture trustee is not subject to the ordinary trustee's duty of undivided loyalty.  Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement."  <u>Meckel v. Cont'l Res. Co.</u>, 758 F.2d 811, 816 (2d Cir. 1985); <u>see also</u> <u>Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.</u>, 838 F.2d 66, 71 (2d Cir. 1988) ("It is . . . well-established under state common law that the duties of an indenture trustee are

strictly defined and limited to the terms of the indenture, although the trustee must nevertheless refrain from engaging in conflicts of interest." (citations omitted)); <u>accord</u> <u>A.G. Capital Funding Partners, L.P. v. State Street Bank & Trust Co.</u>, 896 N.E.2d 61, 66-67 (N.Y. 2008).[24]

The Fund attempts to distinguish the aforementioned cases by claiming that they involved indentures wherein the trustee assumed only ministerial duties, while here U.S. Bank took on substantive responsibilities under the terms of the relevant agreements. For the following reasons, however, the Court finds it plain from the context of this transaction that the Fund manifestly did not intend that U.S. Bank would "step in its shoes" to enforce its rights under the swap. As the Fund acknowledges, U.S. Bank's duties as trustee are limited to those set forth in the trust agreement. Upon inspection, it is apparent that these duties are limited, administrative, and ministerial (rather than substantive) in nature. Such duties include, by way of example, delivering certificates, BTA § 2.6, preparing and transmitting reports to DTC, <u>id.</u> § 4.2, and forwarding notices to the DTC, <u>id.</u> § 5.1, MTAS § 17.[25] While certain provisions

_____

[24] While these cases and the Trust Indenture Act recognize that an indenture trustee may be responsible for exercising a higher standard of care and may be charged with extracontractual duties following the issuer's default, <u>see</u> <u>A.G. Capital</u>, 896 N.E. 2d at 57 n.7 (citing 15 U.S.C. § 77ooo(c)), under the terms of the instant trust agreements, there can be no event of default. MTAS §§ 8, 16.

[25] The Fund's summary judgment papers do not appear to dispute that U.S. Bank's responsibilities with respect to the transmission of notices were limited to forwarding such notices to DTC. Although apparently under no contractual obligation to

of the trust agreement do require the Trustee to "administer" or
"enforce" the Term Asset and the rights of the Trustee under the swap
for the Fund's benefit, it does not follow that the Trustee should be
charged with a generalized duty to advance the Fund's economic
interests in any manner other than with respect to the narrowly
circumscribed responsibilities identified in the trust agreement.
Similarly, while the Fund relies on provisions of the trust
agreements that prohibit the Trustee from impairing the Trust's
interests, from amending the credit default swap, and from protecting
the Fund from improper depletion of the Term Asset, and also charge
the Trustee with safeguarding the Fund's collateral, there is no
reason to read these provisions to impose substantive, as opposed to
ministerial, obligations.

   Even assuming arguendo that U.S. Bank had substantive
responsibilities to advance the Fund's interests with respect to the
challenged substitutions, valuations, and settlement payments, the
trust agreements contain various provisions insulating the Trustee
from liability for actions taken in good faith.  See, e.g., BTA §
8.2(a)(iv) (providing that the Trustee "shall not be personally
liable for any action taken, suffered or omitted by in good faith and
believed by it to be authorized or within the discretion of the
rights or powers conferred upon it by this Agreement"); id. § 8.2(v)
(Trustee "shall not be bound to make any investigation

---

do so, DTC then posted each of these notices to a "Legal Notices
Website" viewable by the Fund.

into the facts of matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, approval, bond or other paper, or document believed by it to be genuine, unless requested in writing to do so by Holders of the Required Percentage . . . ."); id. 8.1(d)(ii) (Trustee "shall not be personally liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts").[26]  The undisputed record shows that with respect to the disputed events, U.S. Bank made the decision to accept the Citi Defendants' notices and valuations after having received the relevant notices from CGML and conferring with outside counsel, and in the case of the Lyondell substitution, asking CGML for further explanation of its belief that the substitution was valid.[27]  Thus, the Court alternatively concludes that U.S. Bank's

---

[26] The Fund objects that U.S. Bank has waived any reliance on these provisions because it failed to include them as affirmative defenses in its answer to the Fund's complaints. However, U.S. Bank's affirmative defenses included the defenses that the Fund's claims fail because they are based on U.S. Bank's having duties that are not supported by the governing agreements and because U.S. Bank fully performed its obligations under these agreements.  See U.S. Bank Answer to Amended Compl., 2/22/10, ¶¶ 193, 202.  The Court finds that these affirmative defenses were sufficiently pleaded, and in any event, the Fund can show no prejudice even if these defenses are assumed to be newly raised, as the Fund has clearly scoured every potentially relevant provision of the governing agreements in preparing its claims in this litigation.

[27] Contrary to the Fund's contentions, U.S. Bank is not asserting an "advice of counsel" defense, which would require the waiver of attorney-client privilege, by referring to the fact of its communication with counsel in the context of demonstrating its good faith.  U.S. Bank has specifically disclaimed reliance

actions with respect to these disputed events were not done negligently or in bad faith as required for the Trustee to be liable in the event these events violated the swap agreements.

Finally, it bears noting that the pre-closing negotiations between the Fund and the Citi Defendants involved U.S. Bank only tangentially. The Fund never negotiated directly with U.S. Bank, and U.S. Bank did not agree to serve as Trustee until the month before closing. See Kraut Decl., Ex. 9. On June 22, 2007, U.S. Bank agreed to serve as Trustee for this transaction in exchange for a $3,500 one-time fee and a $4,500 annual fee, as well as reimbursement for out-of-pocket expenses or extraordinary events. Id. Ex. 10. Given these undisputed facts, the Court finds implausible the Fund's contention that it was relying on the Trust to enforce its rights and economic interests under the swap agreement. It is patent that the issues that arose under the swap's operation are of such complexity that no reasonable investment fund in the plaintiff's position would have permitted its interests under the swap to be protected only by a Trustee, of which it asked no questions prior to closing, and which was being compensated by the Citi Defendants in an amount that was pocket change in comparison to all other economic aspects of this transaction.

---

on a provision of the BTA that allows an advice of counsel defense, see BTA § 8.2(a)(ii). The focus of U.S. Bank's "good faith" defense is on the nature of the inquiry that U.S. Bank undertook, not the substance of the legal advice that was eventually provided.

For these reasons, the Court grants summary judgment to U.S. Bank on the Fund's breach of contract claims.

The Fund also asserts claims that U.S. Bank breached its fiduciary duties as Trustee and contends that such duties required it to "step in the shoes" of the Fund to enforce its rights under the swap. The Court finds, however, that there is no legal support for the broad, free-floating fiduciary duties alleged by the Fund, and that there is no record evidence indicating that U.S. Bank breached the narrow fiduciary duties of an indenture trustee that are recognized by law.

As to the Fund's contentions that U.S. Bank is subject to sweeping fiduciary duties in its capacity as Trustee, the Second Circuit has rejected the notion "that an implied fiduciary duty is imposed on a trustee to advance the financial interests of the debenture holders during the period prior to default." Elliott, 838 F.2d at 73; see also A.G. Capital, 896 N.E.2d at 67 (recognizing that "an indenture trustee owes a duty to perform its ministerial functions with due care, and if this duty is breached the trustee will be subjected to tort liability," but holding that the alleged breach of such duty does not "give[] rise to fiduciary duties").

The Fund is correct that indenture trustees are subject to an implied duty to "refrain from engaging in conflicts of interest," Elliott, 838 F.2d at 71, and from there argues that U.S. Bank was conflicted because it served as indenture trustee for other Beach Street transactions, thus generating at least $185,000 in annual revenues, Pl's 56.1 Re: U.S. Bank ¶ 18, and because it executed the

47

indemnification agreements with CGML with respect to the disputed substitutions.   In considering similar claims, the Second Circuit has disregarded "bald assertions of conflict," and has instead required a showing that the trustee "personally benefitted" from the disputed action.   <u>Elliott</u>, 838 F.3d at 70, 73; <u>see also</u> <u>In re E.F. Hutton Sw. Props. II, Ltd.</u>, 953 F.2d 963, 972 (5th Cir. 1992) (observing that the Second Circuit does not "take into account . . . hypothetical possibilities of conflict," and concluding that "[a] mere hypothetical possibility that the indenture trustee might favor the interests of the issuer merely because the former is an indenture trustee does not suffice" to allege a conflict).[28]   The Court concludes that there is no showing of an actual conflict of interest on this record.   As to the indemnifications, the trust agreements make clear that the Trustee was not expected to expend its own funds or risk liability, BTA § 8.1(d)(iv), so it was reasonable for U.S. Bank to seek indemnification once it became clear that there was a dispute between the Fund and CGML with respect to the Lyondell substitution.   And there is undisputed testimony from U.S. Bank's witnesses that it sought the indemnification after determining the substitution was permissible, <u>see</u> Fahey Dep. at 292; Kraut Decl., Ex.

---

[28] Indeed, there is a strong argument that <u>Elliott</u> is directly controlling, because the allegations in the complaint in that case, which the Second Circuit ultimately dismissed as "bald assertions of conflict of interest," included references to an indemnification agreement between the trustee and issuer and the trustee's service as a trustee under other indentures; <u>i.e.</u>, precisely the same allegations of conflict asserted by the Fund here.   Kraut Decl, Ex. 43 (Verified Complaint, <u>Elliott Assocs. v. J. Henry Schroeder Bank & Trust Co.</u>, No. 86 Civ. 3725 (LBS) (S.D.N.Y. May 6, 1986)), ¶¶ 21-23.

50 (Dep. of Eric J. Donaghey, 12/3/09), at 134; id. Ex. 49 (Dep. of
Michael W. Cooney, 12/1/09), at 169-71, as well as undisputed expert
testimony that indemnifications in similar situations are a common
industry practice, Decl. of Robert I. Landau, 3/9/10, Ex. A, ¶ 26.
As to the Fund's allegations concerning U.S. Bank's status as
"default trustee" for other Citi deals, the Court finds that there is
no evidence supporting the hypothesis that the total revenues from
such business, which are infinitesimal in comparison with the overall
revenues of these financial institutions, in any way affected U.S.
Bank's actions.  Cf. Page Mill Asset Mgmt. v. Credit Suisse First
Boston Corp., 2000 WL 877004, at *2 (S.D.N.Y. June 30, 2000) ("the
existence of a conflict of interest can not be inferred solely from a
relationship between an issuer and an indenture trustee that is
mutually beneficial and increasingly lucrative").  For these reasons,
the Court grants U.S. Bank's motion for summary judgment as to the
Fund's claims alleging that it breached its fiduciary duties.[29]

---

[29] By "bottom-line" order January 18, 2010, the Court denied
the Fund's application to compel U.S. Bank to produce otherwise
privileged documents based on the so-called "fiduciary exception"
and indicated that the reasons for that ruling would follow.
These reasons are manifest in the preceding discussion of the
extent of U.S. Bank's fiduciary duties as Trustee, which the
Court concludes are limited and ministerial in nature.  Assuming
arguendo that the fiduciary exception applies to privilege
assertions by indenture trustees relating to allegations that the
trustee breached its fiduciary duties, see, e.g., AMBAC Indem.
Corp. v. Bankers Trust Co., 151 Misc.2d 334, 340 (N.Y. Sup. Ct.
1991), the Court finds that this exception does not apply to the
particular documents that the Trustee here asserts are
privileged.  These documents relate to the Trustee's request for
legal advice regarding the Lyondell and Charter/Idearc
substitutions and valuation notices, and accordingly, implicate
the substantive terms of CGML's obligations under the
Confirmation rather than the Trustee's limited fiduciary duties

The Court turns finally to the Citi Defendants' contentions
that the Fund lacks standing to bring suit to enforce the
confirmation.[30]  In this respect, the Citi Defendants argue first that
the Fund lacks standing to enforce the Confirmation directly because
it is not a "Party" to the Confirmation and because the Confirmation
expressly states that "No person other than the parties shall have
any right to enforce any provision of this Transaction."
Confirmation, Annex A, at 20.  Next, the Citi Defendants argue that
the Fund lacks standing to sue derivatively on behalf of the Trustee
pursuant to Section 10.3(c) of the Base Trust Agreement, which
provides:

> [n]o Certificateholder . . . shall have any right . . . to
> institute any suit, action or proceeding . . . unless [] such
> Holder previously shall have given to the Trustee a written
> notice of breach and of the continuance thereof and unless

---

to avoid conflicts of interest. Cf. id. (applying fiduciary
exception where plaintiff charged that indenture trustee "invaded
trust accounts and wrongfully appropriated to its own use funds
from an account designated for bond redemption and . . . Trust
charged excessive fees and paid them to itself in advance of
payment of superior obligations"). In addition, all
communications included in the privilege log occurred after March
5, 2009, i.e., well after the Fund objected to CGML's January 28
substitution notice with respect to the Lyondell Reference
Obligation. It is clear from the Court's review of these
communications that they were all made in anticipation of
litigation, a fact that in itself renders the fiduciary exception
inapplicable. See, e.g., Strougo v. BEA Assocs., 199 F.R.D. 515,
524 (S.D.N.Y. 2001) ("while the [fiduciary] exception permits
disclosure of communications relating to the conduct of an
alleged action in proper circumstances, it does not permit
disclosure of communications regarding the defense of a
lawsuit"). For these reasons, the Court denied the Fund's
application to compel these otherwise privileged communications.

[30] U.S. Bank also raised certain objections to the Fund's
standing to sue U.S. Bank as Trustee, which are moot given the
Court's determination that these claims lack merit.

> also the Holders of [two-thirds] shall have made written
> request . . . to institute such action . . . and shall have
> offered to the Trustee such reasonable indemnity as it may
> require against the costs, expenses, and liabilities to be
> incurred . . . and the Trustee . . . shall have neglected or
> refused to institute any such action . . . .

The Court concludes that the Fund has standing to assert claims against the Citi Defendants derivatively on behalf of the Trustee.

With respect to the Fund's standing to sue on behalf of the Trustee pursuant to Section 10.3(c) or otherwise, the Citi Defendants argue primarily that this provision does not give Certificateholders any rights, it merely restricts rights to institute suit under other provisions of the trust agreements, and that there are no such provisions that authorize the claims here asserted against the Citi Defendants. Secondarily, the Citi Defendants contend that the Fund failed to comply with Section 10.3(c)'s demand requirement with respect to claims other than those relating to the Lyondell substitution.

The Citi Defendants' arguments against derivative standing are not without force, and might well have been availing if this were the sort of transaction where the Trustee embraced substantive responsibilities to maximize the Fund's economic interests with respect to the operation of the swap or if there were otherwise good reason to defer to its decision not to sue the Citi Defendants. But, as described above, the Court concludes that the Trustee's obligations under the swap are limited and ministerial in nature. Given this conclusion, it cannot be the case, as the Citi Defendants would have it, that the Fund is without any legal remedy for alleged

breaches of the Confirmation by the Citi Defendants where, as here,
the Trustee refuses to pursue that cause of action.  The contention
that U.S. Bank has the exclusive right to bring suit for breaches of
the swap is simply incompatible with the Trustee's limited role in
this transaction's structure, not to mention its meager compensation.

      Thus, the Court concludes that the Fund is entitled to bring
suit on behalf of the Trustee given the Trustee's alignment with the
Citi Defendants' position, as many courts have permitted trust
beneficiaries to do in analogous circumstances.  Indeed, it is well
established under New York law that "[w]here a claim exists in favor
of the trust (properly speaking, of the trustees in their trust
capacity) against third persons and the trustees are under a duty to
enforce that claim and have improperly and unjustifiably failed to do
so, the beneficiaries may bring a suit on behalf of the trust,
analogous to stockholders' derivative suits on behalf of a
corporation."  Velez v. Feinstein, 87 A.D.2d 309, 314 (1st Dep't
1982); see also Bowen v. U.S. Postal Serv., 459 U.S. 212, 243 (1983)
("a trust beneficiary may sue to enforce a contract entered into on
his behalf by the trustee if, but only if, the trustee 'improperly
refuses or neglects to bring an action against the third person'"
(quoting Restatement (Second) of Trusts § 282(2)).  The beneficiary's
showing of why the beneficiary should be entitled to bring a suit on
behalf of the trustee "will normally require either a showing of a
demand on the trustee[] to bring the suit, and of a refusal so
unjustifiable as to constitute an abuse of the trustee's discretion,
or a showing that suit should be brought and that because of the

trustee['s] conflict of interest, or some other reason, it is futile to make such a demand." <u>Velez</u>, 87 A.D.2d at 315.  Similarly, when presented with allegations by a trust beneficiary not unlike those the Fund asserts here, courts in this District have narrowly construed the scope of so-called "no-action" clauses and/or excused the failure to comply with such clauses.  <u>See, e.g.</u>, <u>Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.</u>, 2004 WL 1444868, at *4-5 & n.4 (S.D.N.Y. June 25, 2004); <u>Williams v. Nat'l Hous. Exch. Inc.</u>, 1996 WL 19017, at *1 (S.D.N.Y. Jan. 18, 1996); <u>see also</u> <u>Feldbaum v. McCrory Corp.</u>, 1992 WL 119095, at *6 (Del. Ch. June 2, 1992) ("The primary purpose of a no-action clause is thus to protect issuers from the expense involved in defending lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors. . . . [Such clauses] protect against the exercise of poor judgment by a single bondholder or a small group of bondholders, who might otherwise bring a suit against the issuer that most bondholders would consider not to be in their collective economic interest.").

Here, the Court finds that the Fund has complied with Section 10.3(c) with respect to its challenges to the Lyondell substitution and that the Fund's failure to make demand as to the other alleged breaches is excused as futile given, <u>inter alia</u>, U.S. Bank's entry into the indemnification agreements with CGML.  Even assuming <u>arguendo</u> that the Fund did not comply with the no-action clause as to any of its claims against the Citi Defendants, the Court would find that the Fund could still sue on behalf of the Trustee.  Indeed, it is difficult to identify any conceivable that is served by requiring

53

compliance with the no-action clause here, or otherwise requiring pre-suit demand, given the Court's conclusions regarding the limited duties of the Trustee and the fact that the Fund is sole beneficial owner of the Class F Certificates, thus nullifying any risk of conflict with other trust beneficiaries.

For these reasons, the Court concludes that the Fund has standing to assert its claims against the Citi Defendants on behalf of the Trustee that are alleged in the Third Claims.

The Court, however, agrees with the Citi Defendants that the Fund lacks standing to sue the Citi Defendants on its own behalf or as a third-party beneficiary to the confirmation. The Confirmation plainly provides that it is an agreement between CGML, as "Party A," and the Trustee, as "Party B," and that "No person other than the Parties shall have any right to enforce any provision of this Transaction." This unequivocal language defeats the Fund's standing to bring claims either directly or as a third party beneficiary. See, e.g., Adelaide Productions, Inc. v. BKN Int'l AG, 38 A.D.3d 221, 226 (1st Dep't 2007).

To be sure, the Fund contends that the Confirmation should be "read together" with the other transaction agreements -- some of which the Fund is a party to and clearly has the right to bring suit to enforce -- as part of an "overarching loss protection agreement." See, e.g., This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998) ("Under New York law, all writings forming part of a single transaction are to be read together."). Relatedly, the Fund assets that certain provisions of the Confirmation refer to terms defined

only in the other transaction documents and that both U.S. Bank and
the Citi Defendants have acted as if the Fund is the real party in
interest with respect to the Confirmation.  Indeed, some courts have
applied this rule of reading all documents to a single transaction in
tandem with one another even when one of those documents contains an
integration clause.  See, e.g., Rhythm & Hues, Inc. v. Terminal
Marketing Co., Inc., 2002 WL 1343759, at *6 n.6 (June 19, 2002).  The
Court has no quarrel with the notion that the various transaction
documents should be "read together" in that they are constituent
parts of a single transaction.  It does not follow, however, that
express limitations in a particular agreement on non-parties' rights
to enforce that agreement should be disregarded.  See, e.g., Coleman
Co. v. Hlebanja, 1997 WL 13189, at *7 (S.D.N.Y. Jan. 15, 1997) ("even
if several contracts that constitute part of the same transaction are
considered one contract, the different obligations within each
contract may be independent and divisible").

Here, the Confirmation uses a defined term "Parties" to refer
to two parties that do not include the Fund, and expressly limits
enforcement of the provisions of that agreement to the two Parties.
The Court sees no reason to disregard these clear provisions simply
because many other agreements formed part of this single transaction.
While, as noted, the Court would be troubled by an interpretation of
the transaction agreements that leaves the Fund without any legal
means to enforce the its interests under the Confirmation where (as
here) the Trustee chooses not to sue, the agreements (including the
Confirmation) permit the Fund to bring claims against the Citi

Defendants on behalf of the Trustee.  Given that available avenue of enforcement, the Court declines to contort the clear provisions of the Confirmation to permit the Fund to sue directly or as third-party beneficiary.  For those reasons, the Court hereby grants the Citi Defendants' motion for summary judgment dismissing the First and Second Claims.

The Court has considered all of the parties' other arguments and finds them to be without merit or otherwise not warranting discussion.  In summary, then, the Court rules as follows:

- The First and Second Claims, brought by the Fund directly and as intended third-party beneficiary, for breach of contract and breach of the Confirmation, are dismissed for lack of standing;

- The Third Claim, brought by the Fund on behalf of the Trustee against the Citi Defendants for breach of the Confirmation, is hereby dismissed in part, leaving for trial only the issues of: (1) with respect to the effectiveness of the Lyondell Credit Event Notice, (a) whether CGML's valuation with respect to the Lyondell Credit Event was premature in light of defects in the initial Credit Event Notice and CGML's subsequent issuance of a revised Credit Event Notice, (b) whether the Fund, by not promptly objecting to the initial Credit Event Notice on this basis, forfeited this challenge to the Notice's effectiveness, and (c) in the event that the Court finds that the challenge is not forfeited and that the valuation was premature, what damages, if any, were incurred; (2) whether CGML's substitution of the Substituted Lyondell Loan was consistent with the senior secured, pari passu, and economic equivalence criteria for substitution as set forth in the Confirmation, and if not, what damages, if any, were caused by the defective valuation; and (3) what damages, if any, were caused by the premature Charter and Idearc valuations;

- all claims against U.S. Bank (i.e., the Fourth, Fifth, Sixth, and Seventh Claims) are dismissed as against U.S. Bank;

- all claims seeking a declaratory judgment as to the validity of the May and August substitutions (*i.e.*, the Sixth and Seventh Claims) are dismissed in full;

- the Eighth Claim, which is brought on behalf of the Trustee and seeks a declaration entitling the Trustee to terminate the Confirmation, may proceed to trial, in that the Fund has standing to bring this claim and genuine issues of material fact exist as to whether the Citi Defendants failed to pay the full amounts of premiums due under the Confirmation, thus constituting an Event of Default; and

- the Citi Defendants' three counterclaims are dismissed.

The remaining parties (the Fund and the Citi Defendants) are directed to call Chambers by no later than September 24, 2010 to schedule the bench trial for the remaining claims (*i.e.*, the remaining aspects of the Third and Eighth Claims). The Clerk of the Court is directed to close the documents numbered 49, 55, 61, and 67 on the docket of this case.

SO ORDERED.

Dated: New York, NY
      September 18, 2010

                         JED S. RAKOFF, U.S.D.J.